# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Docket No. 12-50217
**<u>EN BANC</u>**

JESUS C. HERNANDEZ, et al.,
*Plaintiffs-Appellants*,
v.
JESUS MESA,
*Defendant-Appellee*.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

**MOTION FOR LEAVE TO FILE BRIEF AND TO PARTICIPATE IN ORAL ARGUMENT AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

The American Civil Liberties Union respectfully requests leave (1) to file a limited amicus brief to address the en banc Court's first question regarding the availability of a *Bivens* action in light of the Supreme Court's recent *Abbasi* decision, and (2) to participate in oral argument to address that issue, with amicus' time coming <u>out of the time allotted to counsel for Plaintiffs-Appellants</u>. *See* Fed. R. App. P. 29(a)(8) (allowing amicus to participate in argument with the court's permission).

1

The United States was previously granted permission to file an amicus brief in support of Appellee as well as permission to participate in oral argument.

A copy of the ACLU's amicus brief was submitted (and served) by ECF yesterday, September 6, based on amicus' misunderstanding of this Court's August 11 Order pertaining to amicus briefs. Pursuant to the Court's Order today, amicus is filing this motion for permission to file the brief (attached), as well as to participate in argument.

1. Amicus are the ACLU and four ACLU state affiliates along the U.S.-Mexico border: the ACLU Foundation of Arizona, the ACLU Foundation of New Mexico, the ACLU Foundation of San Diego and Imperial Counties, and the ACLU Foundation of Texas.

2. This Court issued a list of questions for the parties to address in the en banc proceeding. Order of August 11, 2017. If granted leave, amicus' brief and oral argument would address the first question posed by the Court: "Whether, following the Supreme Court's decision in *Ziglar vs. Abbasi*, 137 S.Ct. 615 (2017), plaintiffs can maintain a claim against Agent Mesa based on" *Bivens*.

3. The ACLU has significant experience litigating *Bivens* cases, and has addressed the *Bivens* issue in light of *Abbasi* in other courts. In particular, the ACLU represents Araceli Rodriguez in her claims against another U.S. Border

Patrol Agent for the cross-border shooting of her teenage son, and has addressed *Abbasi* in the case. *Rodriguez v. Swartz*, No. 15-16410 (9th Cir. 2015) (pending).

4. Counsel for Plaintiffs-Appellants consents to this motion. Counsel for Defendant-Appellee has consented to the filing of an amicus brief, but opposes amicus sharing the time allotted to Plaintiffs-Appellants for argument.

5. The United States has stated that its position is: "Although Amicus United States was prejudiced by the untimely filing of the ACLU's proposed brief, because Appellee Mesa has consented to that brief, the United States also consents, and thus it consents as well to the ACLU's participation at argument."

## CONCLUSION

Amicus respectfully requests that the Court grant leave to file an amicus brief and to share oral argument time with counsel for Plaintiffs-Appellants.

Dated: September 7, 2017                    Respectfully Submitted,

/s/ Lee Gelernt

| | |
|---|---|
| Andre Segura | Lee Gelernt |
| Edgar Saldivar | AMERICAN CIVIL LIBERTIES |
| ACLU FOUNDATION OF TEXAS | UNION FOUNDATION |
| 1500 McGowen St | 125 Broad Street |
| Suite 250 | New York, NY 10004 |
| Houston, TX 77004 | T: (212) 549-2660 |
| T: (713) 942-8146 | Lgelernt@aclu.org |
| asegura@aclutx.org | |
| esaldivar@aclutx.org | Cecillia Wang |
| | Cody Wofsy |
| | AMERICAN CIVIL LIBERTIES |

UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T: (415)343-0770
cwang@aclu.org
cwofsy@aclu.org

LEGAL DEPARTMENT
IMMIGRANTS'
RIGHTS PROJECT



September 6, 2017

**VIA ECF**

Lyle W. Cayce
United States Court of Appeals
Fifth Circuit
Office of the Clerk
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130-3408

AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION
IMMIGRANTS'
RIGHTS PROJECT

PLEASE RESPOND TO:
NATIONAL OFFICE
125 BROAD STREET,
18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2660
F/212.549.2654
WWW.ACLU.ORG

CALIFORNIA OFFICE
39 DRUMM STREET
SAN FRANCISCO, CA
94111-4805
T/415.343.0770
F/415.395.0950

OFFICERS AND
DIRECTORS
SUSAN N. HERMAN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

Re: *Hernandez v. Mesa*, No. 12-50217
Letter Brief of *Amici* ACLU et al. in Support of
Plaintiffs-Appellants

Dear Mr. Cayce:

Pursuant to the Court's order of August 11, 2017, *amici* respectfully submit this supplemental letter brief.

**INTRODUCTION AND STATEMENT OF INTEREST**

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization with more than 1,000,000 members dedicated to the principles of liberty and equality embodied in the Constitution and this nation's civil rights laws. The ACLU Foundation of Arizona, the ACLU Foundation of New Mexico, the ACLU Foundation of San Diego and Imperial Counties, and the ACLU Foundation of Texas are the four ACLU state affiliates along the U.S.-Mexico border.[1]

---

[1] This brief is filed with the consent of counsel for defendant-appellee Agent Mesa and plaintiffs-appellants. Although the United States is not a party to this appeal, and is appearing only as *amicus*, it opposes the filing of this brief as untimely. *Amici* understood the Court's order to permit *amicus* briefs to be filed on September 6, *see* Letter to Counsel (Aug. 11, 2017), and therefore believe the brief is timely, and also

1

*Amici* previously submitted an *amicus* brief in this case before the panel and subsequently in the Supreme Court, and the ACLU represents Araceli Rodriguez in her claims against another U.S. Border Patrol Agent for the cross-border shooting of her teenage son. *Rodriguez v. Swartz*, No. 15-16410 (9th Cir. 2015) (pending). *Amici* have expertise regarding the availability of *Bivens* remedies, including having filed an amicus brief in *Bivens* itself. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). The ACLU has also litigated numerous other *Bivens* cases throughout the country in the years since *Bivens* was decided.

*Amici* submit this brief to address only the first question posed by this Court: "Whether, following the Supreme Court's decision in *Ziglar vs. Abbasi*, 137 S. Ct. 615 (2017), plaintiffs can maintain a claim against Agent Mesa based on" *Bivens*? Letter to Counsel (Aug. 11, 2017).[2]

---

understand the Court's rules to require consent only from the parties.

No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person – other than *amici*, its members, or its counsel – contributed money that was intended to fund preparing or submitting this brief.

[2] *Amici* note, however, that the Supreme Court's opinion in this case warrants reconsideration of this Court's en banc holding that the Fourth Amendment claim was barred by *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). In the Supreme Court, Agent Mesa and the United States argued that the *Verdugo-Urquidez* plurality opinion controls the extraterritorial application of the Fourth Amendment and that both *Boumediene v. Bush*, 553 U.S. 723 (2008), and Justice Kennedy's *Verdugo-Urquidez* concurrence, were irrelevant. Resp. Br. at 4, *Hernandez*, 137 S. Ct. 2003 (No. 15-118) (claiming that the Fourth Amendment question "was answered" in *Verdugo-Urquidez*, and *Boumediene*'s "functionality test" "does not apply" to that claim); *id*. at 6 (same); *id*. at 7 (arguing that *Boumediene* "dealt specifically with the application of the Suspension Clause to Guantanamo Bay detainees only"); *id*. at 10-11 (dismissing the impact of Justice Kennedy's *Verdugo-Urquidez* opinion); Br. for the United States at 10-11, *Hernandez*, 137 S. Ct. 2003 (No. 15-118) (asserting that this Court's ruling on the Fourth Amendment was "compelled" by *Verdugo-Urquidez*, which "forecloses" the claim); *id*. at 33 (same); *id*. at 37 (similar); *id*. at 38-42 (dismissing the

2

Here, a *Bivens* remedy is available. *Abbasi* makes clear that *Bivens* remains as a vital check against abusive conduct "in the search-and-seizure context" and that considerations such as national security—while important in some cases—must not be applied abstractly to foreclose a remedy where such considerations are not actually presented. *Abbasi*, 137 S. Ct. at 1856-57, 1861-62. Just as critically, *Abbasi* turned on the fact that plaintiffs were challenging broad *policymaking* by the most senior federal government officials. That factor is entirely absent here, where plaintiffs challenge the action of a single officer who was acting on his own.

## ARGUMENT

*Bivens* held that a damages remedy was available "to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures." *Abbasi*, 137 S. Ct. at 1854. The plaintiff in *Bivens* alleged, among other things, that federal agents arrested him with "unreasonable force." *Bivens*, 403 U.S. at 389. Claims like the one at issue here—that individual federal agents abused their authority and used excessive force without justification—are and have always been at the heart of *Bivens*. As *Abbasi* explained, that remains true today:

> . . . it must be understood that this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose. *Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere.

*Id*. at 1856-57. *Abbasi*, even while holding that a *Bivens* remedy was unavailable under the particular circumstances of that case, confirms that such a remedy is

---

relevance of *Boumediene* and Justice Kennedy's *Verdugo-Urquidez* opinion). In light of the contention that this issue was easily resolved by *Verdugo-Urquidez*, the Supreme Court's decision to vacate this Court's judgment and reserve the Fourth Amendment issue is notable—particularly in light of the Supreme Court's comment that the Fourth Amendment question is "sensitive and may have consequences that are far reaching." *Hernandez*, 137 S. Ct. at 2007. That observation would make little sense if the Court believed that the *Verdugo-Urquidez* plurality opinion already clearly answered the question.

3

available here. Indeed, *Abbasi* could not be more different from this case and *Bivens*: It involved claims against the most senior federal officials challenging policies enacted in the immediate aftermath of September 11, and alternative remedies existed. Both steps of the Court's *Bivens* analysis—whether the case involves a "new context" and whether "special factors" foreclose a remedy—underscore how different the circumstances at issue in *Abbasi* were to those presented here. *Id*. at 1860. The Supreme Court's analysis in *Abbasi* confirms that a *Bivens* remedy is available here.

### A. This Case Does Not Present A New *Bivens* Context.

Where a *Bivens* case does not present a new context, that is the end of the analysis and the court does not proceed to determine whether there are special factors counseling against a remedy. In *Abbasi*, the Supreme Court concluded that the challenge to "high-level executive policy created in the wake of a major terrorist attack on American soil" did present a new context. 137 S. Ct. at 1860. But the Court could not have been clearer that it was not disturbing the core of *Bivens*: A Fourth Amendment claim against a line officer for an unlawful search or seizure. *See id*. at 1856-57; *see also Turkmen v. Hasty*, 789 F.3d 218, 265 (2d Cir. 2015) (Raggi, J., dissenting in relevant part) (observing that "the typical *Bivens* scenario" is "errant conduct by a rogue official"), *rev'd in part, vacated in part sub nom. Abbasi*, 137 S. Ct. 1843.

*Abbasi* listed a number of examples of ways in which the "context" of a case might be new. None of those examples applies here. *First*, the Court observed that "the rank of the officers involved" might make a context new. *Abbasi*, 137 S. Ct. at 1860. This case involves not the Attorney General or even a warden, but a line law enforcement officer, just like the defendants in *Bivens* itself.

*Second*, the Court noted that the "constitutional right at issue" might make the context new, *id.*, but here the right is the same as in *Bivens*—a Fourth Amendment seizure.

*Third*, the Court stated that the "generality or specificity of the official action" might make the context new. *Id.* at 1860. This case involves no challenge to a policy or other general official action. Rather, here the action could not be more specific: The unlawful, fatal use of a weapon.

*Fourth and fifth*, the Court noted that courts should look at the "statutory or other legal mandate under which the officer was operating" and "the extent of judicial guidance available" to officers regarding "how an officer should respond"

4

to the situation. *Id.* That factor plainly does not apply here, as all officers are well aware that the law prohibits them from shooting without justification. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.").

*Sixth*, the Court stated that an additional factor was "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Abbasi*, 137 S. Ct. at 1860. Here, unlike in *Abbasi*, there is no intrusion into policymaking by the other branches. This case does not require an inquiry into the workings of the Executive. Rather, a damages action holding Agent Mesa accountable for his individual actions is no more intrusive than holding the individual agents accountable in *Bivens*—or than holding agents responsible in any of the civil rights actions against individual officers pending in federal courts at any given time.

*Finally*, the Court noted that a new context could arise from other "special factors." *Id.* Defendant-appellee and the United States will likely argue that the extraterritorial nature of this case is a special factor.[3]

But if extraterritoriality was a *per se* bar to *Bivens* actions, that would effectively immunize *all* violations of constitutional rights abroad, including those directed against U.S. citizens. At bottom, this argument is little more than an attempted second bite at the extraterritoriality apple. *See Hernandez v. United States*, 757 F.3d 249, 276 n.2 (5th Cir. 2014) (panel opinion); *Davis v. Passman*, 442 U.S. 228, 246 (1979) (rejecting the argument that *Bivens* should not apply to a Congressman's official conduct because the asserted *Bivens* "special concerns" were "coextensive with the protections" already afforded under the Speech or Debate Clause). If the Fourth Amendment applies extraterritorially to this shooting, then, for the same reasons, this is not a new *Bivens* context. *See also*

---

[3] Based on its post-*Abbasi* Ninth Circuit brief in *Rodriguez v. Swartz*, the United States will also likely argue that the Supreme Court assumed that this case involved a new context because otherwise it would not have remanded the question. That is wrong. The Supreme Court remanded to permit this Court the opportunity to "consider how the reasoning and analysis in *Abbasi may* bear on this case . . . . [and] to address the *Bivens* question in the first instance." *Hernandez*, 137 S. Ct. at 2006-07 (emphasis added). If the Court had resolved that question, it would have said so. *Cf. id.* at 2007 (expressly rejecting qualified immunity). That the Court addressed, by way of background, *Abbasi*'s discussion of "what constitutes a special factor," *id.* at 2006 (internal quotation marks and alteration omitted), does not alter the Court's express instructions.

*infra* (explaining why, even if it is a new context, extraterritoriality provides no reason to deny a *Bivens* remedy).

In short, this case deals with a single officer's decision to unjustifiably shoot and kill a single victim. Accordingly, this is not a new context, and that ends the analysis.[4]

### B. No Special Factors Bar A *Bivens* Remedy In This Case.

Even if the context were new, *Abbasi* reinforces that there are no special factors that would warrant denying plaintiffs a remedy. *Abbasi* rejected a *Bivens* remedy in circumstances that could hardly be more dissimilar from those presented here. First, it involved a challenge to a broad federal policy. Second, the defendants included high-level officials, principally the Attorney General and FBI Director. Third, the claims arose from actions taken in direct and immediate response to the September 11 attacks. Fourth, the plaintiffs had access to alternative remedies. Those four factors are all absent here.

1. Fundamentally, the Court in *Abbasi* rejected a *Bivens* action on the ground that it involved a challenge to executive branch policy. The Court explained that "a *Bivens* action is not a proper vehicle for altering an entity's policy," as the "purpose of *Bivens* is to deter the *officer*." *Abbasi*, 137 S. Ct. at 1860 (internal quotation marks omitted). The Court's opinion repeatedly emphasized the unique nature of the suit as a challenge to a policy. *See, e.g.*, *id.* at 1852-53 (describing policy allegations); *id.* at 1858 (discussing "the formal policy adopted by the Executive Officials"); *id.* at 1860 (plaintiffs challenged an "executive policy"); *id.* at 1860-61 (litigation would trench on "the discussion and deliberations that led to the formation of the policy in question"); *id.* at 1861 ("National-security policy is the prerogative of the Congress and President."); *id.* at 1862 (discussing "high-level policies"); *id.* (plaintiffs challenged "large-scale

---

[4] The Supreme Court divided the claims in *Abbasi* into challenges arising from high-level policies and a separate claim alleging that the Warden permitted abuse apart from those policies. As to the latter, the Court concluded that the context was new, but remanded to the court of appeals to perform the special factors analysis in the first instance. The Court relied heavily on the availability of other remedies—which, as discussed below, are not available here. *See Abbasi*, 137 S. Ct. at 1865. And, unlike in *Abbasi*, here there is no statute remotely like the Prison Litigation Reform Act of 1995, which, the Supreme Court concluded, shows that "Congress had specific occasion to consider" the availability of a remedy for the kind of abuse at issue. *Id*.

policy decisions").

*Abbasi* further emphasized that a challenge to high-level policy decisions can lead to various burdens on the government. The *Abbasi* plaintiffs challenged "major elements of the Government's whole response to the September 11 attacks," a particularly "sensitive" area of "high-level" national security policy. *Id.* at 1861-62. Discovery and litigation in such a challenge, the Court said, "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch" and could "prevent" future high-level officials from "the energetic performance of [their] constitutional duties." *Id.* at 1860-61 (citations and internal quotation marks omitted).

Here, far from "call[ing] into question the formulation and implementation of a general policy," *id.* at 1860, this case concerns only a single agent's use of unjustified deadly force. *Abbasi* firmly reiterated that *Bivens* remedies remain available and necessary for precisely this type of suit: "it must be understood that this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose." *Id.* at 1856. As the Court explained, there are "powerful reasons" for the continued application of *Bivens* actions asserting Fourth Amendment claims in the "common and recurrent sphere of law enforcement." *Id.* at 1856-57. In such situations, *Bivens* "vindicate[s] the Constitution" and "provides instruction and guidance to federal law enforcement officers going forward." *Id.*[5]

2. Further, and critically, *Abbasi* did not just involve policymaking. It involved a suit against senior officials at the highest levels of the federal government. *Id.* at 1851 (defendants were "three high executive officers in the Department of Justice," including the Attorney General, "and two . . . wardens"); *id.* at 1860-62. The Court therefore cautioned that the suit had the potential to interfere with the functioning of the government at an extraordinarily high level. *Id.* at 1860-61; *id.* at 1863 (noting that "high officers who face personal liability for damages might refrain from taking urgent and lawful action in a time of crisis"). Here, in contrast, the suit is against a line officer, just as in *Bivens*.

3. Likewise crucial to the decision in *Abbasi* was the factual context of the case, and specifically its connection to "the Government's whole response to the September 11 attacks." 137 S. Ct. at 1861; *see also id.* at 1851-52, 1858, 1860,

---

[5] In both *Abbasi*, 137 S. Ct. at 1869-70, and *Hernandez*, 137 S. Ct. at 2008, *only* Justice Thomas said that he would limit *Bivens* and its progeny to their precise facts.

7

1862, 1869 (emphasizing the 9/11 context). Because of that context—because the case went beyond "standard law enforcement operations"—the Court concluded that a *Bivens* remedy would "assume dimensions far beyond those present in *Bivens* itself." *Id.* at 1861 (citation and internal quotation marks omitted).

The United States has sought to make this case about more than an agent who used unjustified deadly force, seizing on the fact that the minor victim was on the other side of the border when he was killed. It has invoked generalized concerns about foreign affairs, national security, and terrorism. Br. for the United States at 17-22, *Hernandez*, 137 S. Ct. 2003 (No. 15-118). But *this* case does not involve terrorism or create friction with a foreign sovereign. Future courts may consider whether such issues foreclose a remedy in cases that actually involve those concerns—just as *Abbasi* did with regard to the September 11 context of that case. The analysis is case-by-case.

The United States is thus wrong to assert that it is irrelevant whether this case involves national security concerns so long as the "relevant category" of cases includes those that do raise such concerns. *Id.* at 22 n.10. The Court in *Abbasi* went out of its way to warn against that kind of rote reliance on "national security," stressing that "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Abbasi*, 137 S. Ct. at 1862 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)). A case, in short, must *actually* involve such considerations for them to be relevant.[6]

For the same reason, any suggestion that immigration is a special factor is wide of the mark, as this case involves no immigration issue. Unlike *De La Paz v. Coy*, 786 F.3d 367 (5th Cir. 2015), *cert. denied*, 137 S. Ct. 2289 (2017), this case involves neither civil immigration arrests and proceedings nor remedies available

---

[6] That this analysis is case-specific is underscored by *Mitchell*, 472 U.S. 511, in which the Court rejected the argument for absolute immunity that "the national security functions of the Attorney General are so sensitive, so vital to the protection of our Nation's well-being, that we cannot tolerate any risk that in performing those functions he will be chilled by the possibility of personal liability . . . ." *Id.* at 520. Although the Court upheld the assertion of qualified immunity in *Mitchell*, it indicated that a *Bivens* remedy is available against even the Attorney General. *Id.* at 523 n.7, 535; *cf. Ashcroft v. al-Kidd*, 563 U.S. 731, 734 (2011) (in *Bivens* suit that, like *Abbasi*, involved counterterrorism efforts in the wake of the September 11 attacks, the government did not raise the availability of *Bivens* and the Court did not address it).

under the Immigration and Nationality Act. Moreover, although *Abbasi* itself involved undocumented noncitizens detained for immigration violations, the Court did not rely on this fact, 137 S. Ct. at 1851-52, 1860-65, despite the arguments of the United States that immigration is a special factor, Br. for the United States at 29-30, *Ashcroft v. Abbasi*, 137 S. Ct. 1843 (No. 15-1359).

    4. Finally, the Supreme Court found it to be of "central importance" that the plaintiffs in *Abbasi* had an alternative remedy. The Court thus stated that *Abbasi* was:

> . . . not a case like *Bivens* or *Davis* in which "it is damages or nothing." Unlike the plaintiffs in those cases, respondents do not challenge individual instances of discrimination or law enforcement overreach, which due to their very nature are difficult to address except by way of damages actions after the fact.

137 S. Ct. at 1862 (quoting *Bivens*, 403 U.S. at 410 (Harlan, J., concurring in the judgment)) (citations omitted). This case presents precisely the situation that *Abbasi* distinguished: a challenge to an "individual instance[] of . . . law enforcement overreach." *Id*. And, unlike in *Abbasi*, there is *no* alternative remedy available in this case. For plaintiffs here, "'it is damages or nothing.'" *Id*.

    The hypothetical possibility of restitution in a criminal case cannot deny plaintiffs a *Bivens* remedy. *See Hernandez*, 757 F.3d at 274 (panel opinion). Such prosecutions are exceedingly rare, and such a rule would effectively accord the executive branch exclusive control over redress for, and deterrence of, the unconstitutional actions—including fatal actions—of its own officers. Moreover, such a rule would swallow *Bivens*, as a criminal conviction and restitution is theoretically available for any willful violation of constitutional rights. *See* 18 U.S.C. §§ 242, 3663.

    Notably, in *Bivens* itself the Second Circuit denied a damages remedy in part on the ground that the agents could be criminally prosecuted. But the Supreme Court reversed and permitted a remedy, notwithstanding that the agents could be prosecuted. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 409 F.2d 718, 724-25 (2d Cir. 1969).

    An agent is also absolutely immune from tort actions for conduct in the scope of his employment. 28 U.S.C. § 2679; *see* Pls. Supp. Letter Br. at 9. Similarly, any contention that plaintiffs have a remedy under Mexican law is baseless. Even if foreign law could provide a basis to deny a *Bivens* remedy—and

9

*amici* are aware of no case so holding—the fact is that such a route is foreclosed as well. *See* Brief of Mexican Jurists, Practitioners, and Scholars as Amici Curiae in Support of Petitioners, *Hernandez*, 137 S. Ct. 2003 (No. 15-118), 2016 WL 7229146, at *2 (explaining that "a Mexican court will not be able to provide one of its citizens a remedy" in a cross-border shooting).

Nor does the possibility that the government could in theory choose to make a voluntary payment to plaintiffs amount to a remedy. The question is whether the *plaintiff has* access to "alternative forms of judicial relief," not whether the defendant can hypothesize some action, no matter how improbable, that a third party might conceivably take. *Abbasi*, 137 S. Ct. at 1863 (internal quotation marks omitted); *cf. id.* at 1862-63 (discussing injunctive actions and habeas corpus petitions, both of which are suits the plaintiffs themselves could have initiated). Moreover, such hypothetical possibilities will not deter unlawful actions by officers.

Also unlike in *Abbasi*, there is no indication whatsoever that Congress decided not to legislate in the particular area of cross-border violence. 137 S. Ct. at 1862. In *Abbasi,* the Court noted several specific reasons to believe that Congress had decided not to provide a remedy for the injuries at issue in that case, noting that congressional interest in the government's responses to the September 11 attacks had been "frequent and intense." *Id.* (internal quotation marks and citation omitted). Even more particularly, the Court noted that the government "at Congress' behest" had "compiled a 300-page report" documenting the very problems challenged in the suit. *Id.* (internal quotation marks omitted). There is no remotely comparable indication of intentional congressional inaction in this case.[7]

---

[7] Based on its post-*Abbasi* Ninth Circuit brief, the United States will likely point to other statutes and cases to suggest that Congress has foreclosed a *Bivens* remedy for injuries abroad. But all of its authorities are wide of the mark. For example, *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016), underscored that the "presumption against extraterritoriality" is a "canon of statutory construction"—a default rule requiring Congress to "affirmatively and unmistakably" indicate extraterritoriality. The whole point of *Bivens*, however, is to provide a remedy in the absence of statutory authorization. Moreover, even where the presumption applies, if the relevant conduct "occurred in the United States, then the case involves a permissible domestic application." *Id.* at 2101. Here, of course, all of Agent Mesa's conduct occurred in the United States.

And, contrary to the argument the government has previously advanced, Congress did not implicitly foreclose a *Bivens* remedy for extraterritorial constitutional violations by barring claims under the Federal Tort Claims Act (FTCA) against the United States for injuries that occur abroad. That bar does not, of course, apply to *Bivens* claims, 28 U.S.C. § 2679(b)(2)(A), and where Congress intends to foreclose a *Bivens* remedy, it does so expressly, *see, e.g.*, *Hui v. Castaneda*, 559 U.S. 799, 806-08 (2010) (holding that Congress "plainly" granted blanket immunity for public health service personnel, including from *Bivens* claims). Moreover, the fact that Congress created the foreign country exception in the FTCA has no bearing on whether a *Bivens* claim is available. The law applied in an FTCA claim is the substantive tort law of the forum in which the injury occurred. Thus, as the Supreme Court has explained, "what Congress intended to avoid by the foreign country exception" was the "application of foreign substantive law" in FTCA cases. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 707 (2004). Those concerns are inapplicable where, as here, the agent was standing on U.S. soil and the Fourth Amendment, not Mexican tort law, supplies the substantive rule of decision.[8]

---

Likewise irrelevant is 42 U.S.C. § 1983's terminology. Section 1983, in providing for damages for the violation of constitutional rights by state officers, extends protection to "any citizen of the United States or other person within the jurisdiction thereof." That language is clearly meant to underscore that the statute's protection extends beyond citizens, not to address the remote possibility of state agents freelancing abroad. And, finally, even if the government is correct that the Torture Victim Protection Act exempts U.S officers from liability, *see* 28 U.S.C. § 1350 Note A, that is of no significance. The TVPA is directed at extrajudicial killing and torture *by foreign officials*, *id.* § 2(a), who would not be subject to *Bivens* liability. A congressional remedy was therefore required to deal with the specific situation of foreign officials.

[8] *Sosa v. Alvarez-Machain* noted that "an early draft of the FTCA" "would have exempted all claims 'arising in a foreign country in behalf of an alien.'" 542 U.S. at 707 (quoting H.R. 5373, 77th Cong., 2d Sess., § 303(12)). The last five words were deleted in the final bill, such that the enacted foreign-country exception applies "whether or not the claimant is an alien." *Id.* (internal quotation marks omitted). The early draft having been rejected, the enacted bill "thus codified Congress's unwilling[ness] to subject the United States to liabilities *depending upon the laws of a foreign power*." *Id.* (emphasis added, internal quotation marks omitted). Consequently, because the enacted exception applies equally to U.S. citizens and non-citizens, relying on it to foreclose a remedy here

5.  This case of course involves an aspect not present in *Abbasi*: the applicability of the Constitution to a shooting victim just over the U.S.-Mexico border.  But that consideration does not warrant the denial of a *Bivens* remedy.

Permitting this form of double counting could eliminate *Bivens* altogether and has been rejected by the Supreme Court.  In *Davis*, the Supreme Court held a *Bivens* remedy was available despite the concededly—indeed, obvious—"special concerns" presented by a sex discrimination suit by a terminated employee "against a Congressman for putatively unconstitutional actions taken in the course of his official conduct."  442 U.S. at 246.  Those concerns were "coextensive with the protections afforded by the Speech or Debate Clause," the Court held, such that if the Congressman's actions were not "shielded by the Clause," the considerations that were "coextensive" with it did not bar a *Bivens* remedy.  *Id.*

Moreover, nearly every constitutional analysis involves competing considerations that could be reframed as "special factors."  For example, in *Rhodes v. Chapman*, 452 U.S. 337 (1981), the Supreme Court noted that an Eighth Amendment prison condition claim implicated "the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system."  *Id.* at 352.  That consideration could be described as a special factor, yet just one year later the Court in *Carlson v. Green*, 446 U.S. 14 (1980), held that such prison condition claims "involve[] no special factors counseling hesitation."  *Id.* at 19 (recognizing *Bivens* actions for prison condition claims).  One thus cannot simply point to the difficulty of a constitutional question as a reason to deny a *Bivens* remedy.  And, as noted, a blanket rule against extraterritorial *Bivens* actions would effectively immunize all violations of constitutional rights abroad, including those directed against U.S. citizens.

If the Fourth or Fifth Amendments apply here, then this shooting is governed on the merits by the ordinary constitutional prohibition on unjustified deadly force, and the fact that the extraterritorial question was presented does not provide any additional reason to deny a remedy.  Making a remedy available for a shooting death just on the other side of the border, as it is available just on this side, does not present "a host of considerations that must be weighed and appraised."  *Abbasi*, 137 S. Ct. 1857 (internal quotation marks omitted).  It would not impose "a new substantive legal liability," *id*. (internal quotation marks omitted), so much as apply a well-settled and amply warranted form of legal liability to actions taken

---

would mean that there is likewise no *Bivens* remedy for the unlawful killing by U.S. border patrol agents of a *U.S. citizen* standing just over the border.

12

inside the United States whose fatal consequences extend a matter of feet into Mexico.

*   *   *

This case involves the unjustified killing of a teenager by a U.S. Border Patrol agent standing on United States soil. In this context, there is no good reason to doubt the "efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong." *Abbasi*, 137 S. Ct. 1858. A *Bivens* action provides the only meaningful remedy.

## CONCLUSION

The Court should reverse the district court.

Respectfully Submitted,

 /s/ Lee Gelernt
Lee Gelernt
Jonathan Hafetz
David Hausman
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
T: (212) 549-2660
lgelernt@aclu.org
jhafetz@aclu.org
dhausman@aclu.org

Cecillia Wang
Cody Wofsy
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T: (415)343-0770
cwang@aclu.org
cwofsy@aclu.org

Andre Segura
Edgar Saldivar
ACLU FOUNDATION OF TEXAS
1500 McGowen St
Suite 250
Houston, TX 77004
T: (713) 942-8146
asegura@aclutx.org
esaldivar@aclutx.org

Kathleen E. Brody
Brenda Munoz Furnish
William Peard
ACLU FOUNDATION
OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
T: (602) 650-1854
kbrody@acluaz.org
bmunozfurnish@acluaz.org
bpeard@acluaz.org

Mitra Ebadolahi
ACLU FOUNDATION OF SAN
DIEGO
AND IMPERIAL COUNTIES
P.O. Box 92138
San Diego, CA 92138-7131
T: (619) 232-2121
mebadolahi@aclusandiego.org

Maria M. Sanchez
ACLU of NEW MEXICO
P.O. Box 566
Albuquerque, NM 87103
T: (505) 266-5915, Ext. 1004
msanchez@aclu-nm.org

# CERTIFICATE OF SERVICE

      I hereby certify that on September 6, 2017, I filed and served the foregoing with the Clerk of the Court by causing a copy to be electronically filed via the appellate CM/ECF system. I also hereby certify that the other participants in the case are registered CM/ECF users and will be served via the CM/ECF system.

                                              /s/ Lee Gelernt
                                              Lee Gelernt, Esq.
                                              Dated: September 6, 2017

# CERTIFICATE OF COMPLIANCE

      This brief complies with the page limitation included in the Letter to Counsel (Aug. 11, 2017).

      I certify that this brief complied with typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally-spaced typeface using Microsoft Office 2013 in 14 point Times New Roman.

                                              /s/ Lee Gelernt
                                              Lee Gelernt, Esq.
                                              Dated: September 6, 2017

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the FEDERAL RULES OF APPELLATE PROCEDURE, *amici* make the following disclosures:

1.) For non-governmental corporate *amici* please list all parent corporations:
   None
2.) For non-governmental corporate *amici* please list all publicly held companies that hold 10% of more of the party's stock:
   None

                                              /s/ Lee Gelernt
                                              Lee Gelernt, Esq.
                                              Dated: September 6, 2017